# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

L.G. and E.G., *on behalf of* E.G.                  :
                 **Plaintiffs,**         :          **CIVIL ACTION**
                                              :
      **v.**                                              :
                                                :
**WISSAHICKON SCHOOL DISTRICT**           :          **No. 06-0333**
                 **Defendant.**          :          **NO. 06-3816**
                                                  **CONSOLIDATED**

**NORMA L. SHAPIRO, J.**                                                    **JANUARY 4, 2011**

## MEMORANDUM

        L.G. and E.G. bring this action under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1400 *et seq.*, on behalf of their minor son, E.G., an autistic student

residing in the Wissahickon School District.  Plaintiffs allege defendant Wissahickon School

District ("Wissahickon") failed to provide E.G. with a free and appropriate public education

("FAPE") for the 2004-2005 and 2005-2006 school years.  Plaintiffs request reimbursement of

private school tuition and related expenses, and compensatory education.  Plaintiffs' claims were

heard by a Pennsylvania Special Education Hearing Officer ("Hearing Officer") and reviewed by

a Special Education Due Process Appeals Panel ("Appeals Panel"); both denied relief.  Plaintiffs,

filing in this court, seek reversal of the decision of the Appeals Panel.  The parties have now filed

cross-motions for judgment on the administrative record.  After reviewing the administrative

record and considering the parties' arguments, defendant's motion is granted and plaintiffs'

motion is denied.

## I.      BACKGROUND

        E.G. is a minor diagnosed with autism disorder at the severe end of the spectrum.  He is

functionally nonverbal and apraxic, with low-functioning cognitive abilities. At the time his parents brought this action, he communicated primarily through sign language but was able to put four or five words together to form a sentence. He also engaged in autistic behaviors such as vocalizations, in which he made noises resembling a whining sound, tugging on his ears and folding them over onto themselves, and chewing on his shirt collar or sleeve.

In January 2001, when he was six years old, E.G.'s parents registered him at Wissahickon. E.G. was deemed eligible for special education services and support under IDEA.[1] Wissahickon developed an individualized education program ("IEP"), providing placement in a full-time autistic support classroom at an elementary school in a neighboring school district and a publicly funded home program. E.G. received instruction under this IEP until January 2003, when his parents moved to the Council Rock School District, so E.G. could participate in a verbal behavior program offered by that district.[2] E.G. attended Council Rock's verbal behavior program for the remainder of the 2002-2003 school year.

---

[1] IDEA requires that a school district receiving federal education funding identify, locate, and evaluate all children with disabilities residing in their district, and develop and implement a practical method for providing a free and appropriate public education to such disabled children, including needed special education and related support services. 20 U.S.C. § 1412(a). A child with a disability includes, among others, a child with autism "who, by reason thereof, needs special education and related services." *Id.* § 1401(3)(A).

[2] The verbal behavior ("VB") method of teaching autistic children is a branch of applied behavioral analysis ("ABA"). ABA and the VB method emphasize the use of rewards to reinforce positive life skills. As a child begins to master new skills, rewards are faded. The VB method also emphasizes a child's requesting what is desired as a means to develop verbal skills. Due Proc. Hr'g Tr. 694 (Testimony of John Hampel). For example, if a child requests that a television be turned on, the VB method instructs that the television be turned on with the volume set low, so the child must ask to have the volume increased. E.G.'s mother has received over 500 hours of training in the VB method and believes it should be a primary component of E.G.'s education. Due Proc. Hr'g Tr. 1155-58 (Testimony of E.G.'s mother).

E.G.'s parents returned to Wissahickon in the summer of 2003 and enrolled E.G. in Lower Gwynedd Elementary School ("Lower Gwynedd") for the 2003-2004 school year. Wissahickon proposed an IEP providing placement in a full-time autistic support classroom, but unlike E.G.'s prior IEP, it did not include a publicly funded home program. The parents rejected the proposed IEP, and enrolled E.G. in the Mulberry School, a private nursery and day care center, where he attended kindergarten classes. Had he remained at Lower Gwynedd, E.G. would have been placed in second grade.

While E.G. attended the Mulberry School, his parents worked with Wissahickon personnel to prepare for E.G. to enter second grade at Lower Gwynedd for the spring term of the 2003-2004 school year. The parties met several times to develop a new IEP. The resulting IEP (the "December 2003 IEP") provided for inclusion in a regular education classroom supplemented by learning support, but did not include a home program. The parents requested a due process hearing to challenge the December 2003 IEP's: (1) lack of a publicly funded home-based verbal behavior program; (2) statement of E.G.'s educational levels; and (3) method of data collection. In January 2004, following a due process hearing, the Hearing Officer approved the IEP's denial of a home program, but ordered, among other things, that the IEP provide for daily rather than weekly data collection. The Appeals Panel affirmed, and the parents did not take further legal action. E.G. joined a second grade class at Lower Gwynedd for the remainder of the 2003-2004 school year. E.G. was the only learning impaired student in the regular education classroom. His parents felt his differences were accentuated during interactions with his non-disabled peers.

E.G.'s December 2003 IEP was modified following the January 2004 order of the

Hearing Officer.  In April 2004, the parties agreed to a new IEP (the "April 2004 IEP") continuing most of the December 2003 IEP, but revising the method of data collection from weekly to daily.  The April 2004 IEP provided for instruction in a regular second grade classroom with a full-time one-to-one aide, except for reading, writing, and math instruction in a separate learning support classroom.  The April 2004 IEP also provided weekly occupational, physical, and speech therapy.  To implement the IEP, teachers drew from a variety of teaching methodologies, including the VB method, but did not exclusively apply the VB method.  At the conclusion of the 2003-2004 school year, E.G.'s second grade teacher, Mrs. Faust, believed he made meaningful educational progress.  She testified that in the short amount of time E.G. attended her class, his attention skills improved, he began to participate in classroom activities, and he exhibited increased confidence interacting with his peers.  Due Proc. Hr'g Tr. 149-50 (Testimony of Margaret Faust).  He also improved his ability to write his name, recollect numbers and letters, and order events into a sequence.  *Id.*  Although he engaged in autistic behaviors such as vocalizations and tugging on his ears, the frequency of the behaviors reduced, and his teacher did not find the behaviors disruptive to the class.  *Id.* at 59-60, 93, 147-48.

The parties met in August 2004 to plan for the 2004-2005 school year, but could not agree on a new IEP.  E.G.'s parents decided to enroll him in the Nexus School ("Nexus"), a private school, rather than have him continue at Lower Gwynedd.  Nexus educates seven to nine students per school year; all are autistic.  Nexus did not develop an IEP for E.G., but devised an educational program of half a day in a one-to-one setting and the other half in a classroom with two other severely autistic students.  Tuition at Nexus for the 2004-2005 school year totaled $50,000.  Wissahickon denied the parents' request for tuition reimbursement because it was

prepared to offer a FAPE under the April 2004 IEP.

The parties met again in May 2005 to discuss developing an IEP for the 2005-2006 school year. To prepare an IEP, Wissahickon personnel reviewed the April 2004 IEP and Nexus progress reports, observed E.G. in a Nexus classroom, and prepared a re-evaluation report assessing E.G's educational levels. The resulting IEP (the "September 2005 IEP") provided for a combination of instruction in regular education and learning support classrooms, a one-to-one aide for assistance in the regular education classroom, and occupational, physical, and speech therapy. The teacher who would have been assigned as E.G.'s regular education teacher had teaching experience with autistic students; she also attended all the IEP meetings and met separately with the learning support teacher to plan curriculum modifications for E.G. The September 2005 IEP called for application of the VB method in conjunction with other teaching methods. E.G.'s parents rejected the September 2005 IEP, and E.G. continued at Nexus for the 2005-2006 school year. Tuition totaled $55,000.

E.G.'s parents requested a due process hearing on October 19, 2005 to obtain reimbursement of the Nexus private school charges for the 2004-2005 and 2005-2006 school years, compensatory education, and payment of a prior reimbursement obligation. The due process hearing lasted four days, and transcripts of the testimony total over one thousand pages. On April 4, 2006, the Hearing Officer issued a detailed opinion holding that Wissahickon offered E.G. a FAPE for the 2004-2005 and 2005-2006 school years, and denying reimbursement. The Hearing Officer reasoned that the parties' fundamental dispute concerned teaching methodologies: inclusion in a regular education classroom versus a special education classroom, and strict application of the VB method versus a combination of several methods, including VB,

for teaching an autistic child. Because IDEA requires only that an educational program be reasonably calculated to confer a meaningful educational benefit, the Hearing Officer found that E.G.'s IEPs met IDEA's substantive requirement, and declined to endorse a particular teaching methodology. The Appeals Panel affirmed. The parents then sought relief in this court. Before the court are the parties' cross-motions for judgment on the administrative record.

## II.    DISCUSSION

IDEA requires that public schools receiving federal education funding make a FAPE available to all disabled children. 20 U.S.C. § 1412(1)(A). A FAPE is "a basic floor of opportunity," consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 201 (1982). A school district must evaluate a disabled student and design an IEP to meet the student's unique needs. 20 U.S.C. § 1414(d)(1)(A); *Honig v. Doe*, 484 U.S. 305, 311 (1988). If parents are not satisfied with their child's IEP, they may request an impartial due process hearing. 20 U.S.C. § 1415(b)(2). If concerns remain, Pennsylvania provides the right to appeal to a Due Process Appeals Panel. 22 Pa. Code § 14.162. Any party still dissatisfied may then bring a civil action in state or federal court. 20 U.S.C. § 1415(e).

E.G.'s parents seek reversal of the decision of Appeals Panel. The Appeals Panel had adopted the Hearing Officer's findings and affirmed the decision to deny the parents relief. The parents argue the administrative tribunals erred because Wissahickon failed to provide their son with a FAPE for the 2004-2005 and 2005-2006 school years. As the parents enrolled E.G. in a private school rather than continue his education at Wissahickon, they seek reimbursement of private school tuition and related expenses, and compensatory education. The parents also argue

6

that the administrative tribunals unfairly criticized and rejected the testimony of their expert witnesses, and that the administrative tribunals failed to consider their request for payment of a reimbursement obligation owed by Wissahickon. Wissahickon argues the decision of the Appeals Panel should be affirmed because it properly concluded Wissahickson provided a FAPE for the 2004-2005 and 2005-2006 school years, and properly affirmed the Hearing Officer's factual findings and credibility determinations.

A.    **Standard of Review**

We review the decision of the Appeals Panel, as this is the final decision of the state authorities. *See Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 527-29 (3d Cir. 1995). Because the Appeals Panel adopted the Hearing Officer's findings and affirmed its conclusions, discussion of the Hearing Officer's decision is also necessary.

A district court reviewing administrative adjudications of disputes arising under IDEA must make factual findings "by a preponderance of the evidence" while also giving "due weight" to the findings of the administrative tribunals. 20 U.S.C. § 1415(i)(2)(C); *Rowley*, 458 U.S. at 204-06. This standard requires a "modified *de novo* review." *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). "Factual findings from the administrative proceedings are to be considered prima facie correct." *Id.* A district court must defer to the administrative tribunals' factual findings and credibility determinations "unless it can point to contrary nontestimonial extrinsic evidence in the record." *Id.*; *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). This ensures that courts, which "lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy,'" do not "impos[e] their view of preferable educational

methods upon the States." *Rowley*, 458 U.S. at 207.

**B.     Plaintiffs' Expert Witnesses**

The parents contend the decision of the Appeals Panel should be reversed because it adopted the Hearing Officer's credibility determinations concerning their expert witnesses. The Hearing Officer accorded no weight to the testimony of the parents' expert witnesses. The parents' expert witness, Dr. Kristen Vallone, Ph.D., was a behavioral analyst and Director of Consultation Services for Melmark, a non-profit agency dedicated to providing assistance to people with disabilities. Due Proc. Hr'g Tr. 298-301 (Testimony of Kristen Vallone). Dr. Villone is responsible for overseeing Melmark's consultations with school districts to design behavioral programs for students with disabilities. *Id.* at 300. Dr. Villone testified that: (1) Wissahickon should have conducted a functional behavioral assessment of E.G. because he displayed interfering and disruptive behaviors; (2) the proposed September 2005 was inadequate for lack of full-time supervision by an aide trained in the VB teaching methodology; (3) the proposed academic content was too advanced; and (4) placement at Nexus was appropriate because its staff successfully used behavioral methods to instruct E.G. *Id.* at 301-04, 308-09, 311-12, 321, 337-38, 350-74. The parents' expert witness, Dr. John Hampel, Ph.D., was the Assistant Administrator of Special Education and Behavioral Analyst for the Wassachusetts Regional School District in Holden, Massachusetts. Due Proc. Hr'g Tr. at 648 (Testimony of John Hampel); Pls.' Due Proc. Hr'g Ex. 99. Dr. Hampel testified that: (1) the September 2005 IEP proposed curriculum that was too advanced, even with modifications; and (2) Nexus was an appropriate placement for E.G. because its staff implemented VB teaching techniques in primarily one-to-one sessions. Due Proc. Hr'g Tr. 692-700 (Testimony of John Hampel).

8

The Hearing Officer accorded no weight to the testimony of Dr. Villone and Dr. Hampel. The Hearing Officer reasoned that Dr. Villone's testimony lacked an adequate foundation for evaluating the educational programs offered by Nexus and Wissahickon. Dr. Villone did not know the composition of Nexus's student body, if Nexus had developed an IEP for E.G. , or the qualifications and training of Nexus personnel. Dr. Villone did not observe E.G. in a class at Lower Gwynedd, and did not review Wissahickon's proposed September 2005 IEP providing for curriculum modifications and work in small groups. The Hearing Officer reasoned that Dr. Hampel's testimony was speculative because, although he observed a class at Wissahickon, it was not the class in which E.G. would have been placed. For both witnesses, the Hearing Officer found the testimony biased in favor of the VB method at the exclusion of other teaching methods.

Review of the administrative record reveals no contrary nontestimonial evidence to warrant overturning the Hearing Officer's credibility determinations. The Hearing Officer aptly noted deficiencies in Dr. Villone's and Dr. Hampel's knowledge of Wissahickon's proposed educational program, including failure to observe the regular education class in which E.G. would have been placed or E.G.'s participation in a Lower Gwynedd classroom. Due Proc. Hr'g Tr. 406 (Testimony of Kristen Vallone); Due Proc. Hr'g Tr. 663-64 (Testimony of John Hampel); Pls.' Due Proc. Hr'g Ex. 43. As the Hearing Officer explained, the experts did not observe anything resembling the education E.G. would have received at Lower Gwynedd. Dr. Villone's failure to review aspects of E.G.'s proposed program, such as the September 2005 IEP and the curriculum modifications planned by the regular education teacher, raised doubts about the accuracy of her conclusion that Wissahickon's proposed program was too advanced for E.G. Due Proc. Hr'g Tr. 381-82, 396-97, 412-13 (Testimony of Kristen Vallone); Due Proc. Hr'g Tr.

544-46, 553-56, 562-63 (Testimony of Robin Daher).

We also find no nontestimonial evidence of record contrary to the Hearing Officer's finding that the expert witnesses were biased in favor of the VB method. Dr. Villone testified that E.G. required instruction from teachers well-trained in applied behavioral analysis, and found inadequate any instruction that does not adhere to the VB method. Due Proc. Hr'g Tr. 312-13, 321 (Testimony of Kristen Vallone). Dr. Hampel's expert report takes application of the VB method as a metric by which to evaluate the adequacy of education to be provided by Wissahickon; because he found deficiencies in Wissahickon's application of the VB method, he concluded that Wissahickon could not provide an appropriate education for E.G. *See* Pls.' Due Proc. Hr'g Ex. 38. After review of the record, we give due weight to the Hearing Officer's determination that the expert witnesses' testimony should be accorded no weight because it was lacking in an adequate foundation and biased in favor of VB methodology.

### C. Tuition Reimbursement and Compensatory Education

The parents request reimbursement of tuition and related expenses, including transportation, private evaluations, the costs of a home program, and a summer 2005 extended school year ("ESY") program,[3] because Wissahickon did not provide E.G. a FAPE for the 2004-2005 and 2005-2006 school years. The parents also request compensatory education, i.e., additional hours of education to compensate for the time in which the disabled student did not receive a FAPE. *Lester H. v. Gilhool*, 916 F.2d 865, 871-73 (3d Cir. 1990).

In *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985), the

---

[3] An ESY program continues the goals and objectives of the IEP during the summer months, after the school year has concluded, so the student does not regress from one school year to the next.

Supreme Court held that IDEA empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." To obtain tuition reimbursement, the parents must show:[4] (1) the public school did not provide a FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement. *See Florence Cnty. Sch. Dist. v. Carter ex rel. Carter*, 510 U.S. 7, 12-16 (1993); *Burlington*, 471 U.S. at 369-70, 373-74. The right to compensatory education also depends upon denial of a FAPE; "a disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 250 (3d Cir. 1999).

Two facts determine whether the school district has provided a FAPE. First is whether a school district complied with IDEA's procedural requirements. *Rowley*, 458 U.S. at 203, 206-07. "[T]he centerpiece of the procedural scheme is the IEP." *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 177 (3d Cir. 1988) (citing *Rowley*, 458 U.S. at 208). IDEA contains numerous procedural "safeguards to ensure proper development of the IEP and to

---

[4] While the Court of Appeals initially placed the burden of proof on school districts, *see Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1219 (3d Cir. 1993), the Supreme Court held in *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005), that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer* was decided on November 15, 2005, after E.G.'s parents filed for due process but before the due process hearing began on December 6, 2005. At the due process hearing, counsel for plaintiffs assumed the burden of proof. Due Proc. Hr'g Tr. 14, 691 (Statement of Gary Masterson, Esq., on behalf of plaintiffs). This was consistent with the decisions of several district courts placing the burden of proof on plaintiffs with cases pending at the time the Supreme Court decided *Schaffer*. *See, e.g., Fisher v. Stafford Twp. Bd. of Educ.*, No. 05-2020, 2006 WL 2534399, at *3 (D.N.J. Aug. 31, 2006); *Greenwood v. Wissahickon Sch. Dist.*, No. 04-3880, 2006 WL 279085, at *1 (E.D. Pa. Feb. 3, 2006); *Bay Shore Union Free Sch. Dist. v. T. ex rel. R.*, 405 F. Supp. 2d 230, 238 (E.D.N.Y. 2005).

protect the rights of parents and guardians to challenge the IEP." *Oberti v. Bd. of Educ.*, 995 F.3d 1204, 1213 n.16 (3d Cir. 1993) (citing *Rowley*, 458 U.S. at 205-07). Second is whether the school district complied with IDEA's substantive requirement to provide an educational program reasonably calculated to confer a meaningful educational benefit. *Rowley*, 458 U.S. at 204, 206-07.

Both IDEA's procedural and substantive requirements are at issue here. The parents contend Wissahickon violated IDEA's substantive requirement because the April 2004 and September 2005 IEPs were inadequate, and Wissahickon was not ready, willing, or able to implement the September 2005 IEP for the 2005-2006 school year.[5] The parents also contend

_____

[5] The parents also argue that, when considering whether Wissahickon denied E.G. a FAPE for failure to provide IEPs reasonably calculated to confer meaningful educational benefit, the Appeals Panel erred by limiting the parents' claims to alleged denials of a FAPE occurring after October 17, 2004. The parents filed for due process on October 17, 2005, and the Appeals Panel, citing *Montour Sch. Dist. v. S.T.*, 805 A.2d 29 (Pa. Commw. Ct. 2002), imposed a one-year time limit on plaintiffs' claims. *Montour* held that a one-year equitable limitation applied to claims for compensatory education under IDEA. *Id.* at 36-40.

*Montour* is inapplicable. IDEA was amended on December 3, 2004, effective July 1, 2005, to provide a two-year time limitation for tuition reimbursement and compensatory education claims. 20 U.S.C. § 1415(f)(3)(C). IDEA's statutory limitation period supplants the equitable limitation imposed in *Montour*. Under IDEA's amended statute of limitations, a court may consider alleged denials of a FAPE occurring for a two-year period prior to parents' request for a due process hearing. The Court of Appeals recently held that IDEA's amended statute of limitations applies in cases where, as here, a request for due process is filed after the statute's effective date, but the events giving rise to the due process request occurred before the statute's enactment. *See Steven I. v. Cent. Bucks Sch. Dist.*, 618 F.3d 411 2010 WL 3239469 (3d Cir. 2010).

Although the Appeals Panel incorrectly cited *Montour*'s one-year equitable limitation rather than IDEA's amended two-year statute of limitations in 20 U.S.C. § 1415(f)(3)(C), this has no implication for the Appeals Panel's substantive conclusion that Wissahickon provided a FAPE. The parents seek tuition reimbursement and compensatory education for the 2004-2005 and 2005-2006 school years, not for the 2003-2004 school year. IDEA's amended two-year statute of limitations is therefore relevant only to the extent that events occurring prior to October17, 2004 resulted in a denial of a FAPE for the 2004-2005 and 2005-2006 school years. In deciding this question, the Appeals Panel did not err. Like the decision of the Hearing Officer before it, the Appeals Panel's opinion considers events occurring

Wissahickon violated IDEA's procedural requirement that a school district have an IEP in effect for each disabled student residing in its district. E.G.'s April 2004 IEP expired in April 2005, and E.G. was without an IEP from April to September 2005.

### 1. Adequacy of the April 2004 and September 2005 IEPs

An IEP must be "reasonably calculated" to enable a student to "receive 'meaningful education benefits'" in light of his or her potential. *See Shore*, 381 F.3d at 198 (quoting *Polk*, 853 F.2d at 181). An IEP must offer "more than a trivial or de minimis educational benefit;" "the provision of merely more than a trivial educational benefit does not meet the meaningful benefit requirement." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006). An IEP must facilitate "significant learning." *Ridgewood*, 172 F.3d at 247 (citing *Polk*, 853 F.2d at 182). The Appeals Panel's decision that the IEP did so was correct.

### a. Functional Behavioral Analysis

The parents argue that the April 2004 and September 2005 IEPs were inadequate because Wissahickon did not conduct a functional behavior analysis ("FBA")[6] prior to developing the IEPs, even though E.G. had engaged in interfering behaviors such as loud vocalizations and tugging on his ears. Wissahickon responds that E.G. engaged in behaviors that did not impede

---

before October 17, 2004. For example, when discussing whether the proposed September 2005 IEP adequately addressed E.G.'s behavioral issues, the Appeals Panel noted that teachers did not find E.G.'s behaviors interfered with classroom learning during the spring of the 2003-2004 school year, when E.G. attended second grade at Lower Gwynedd. The Appeals Panel also reasoned that the September 2005 IEP was adequate because it was modeled after E.G.'s prior April 2004 IEP, under which he made measurable progress. Because the Appeals Panel considered events occurring before October 17, 2004 in deciding whether Wissahickon denied E.G. a FAPE for the 2004-2005 and 2005-2006 school years, the error with regard to the appropriate time limitation was harmless and is not a ground for reversal.

[6] A FBA tracks the nature, duration, and frequency of interfering behaviors and theorizes about their causes, such as a call for attention or an attempt to avoid an undesirable task.

his or other students' learning, and E.G.'s IEPs addressed any behavioral issues.

If a child's behavior impedes his or her learning, the IEP team must consider strategies and support services to address the behavior. 34 C.F.R § 300.346(a)(2)(i) (2004).[7] The Appeals Panel concluded that the April 2004 and September 2005 IEPs were adequate to address E.G.'s behaviors without a FBA because, as the Hearing Officer found, E.G.'s behaviors did not impede classroom learning. Testimony at the due process hearing supports this finding. E.G.'s second grade teacher at Lower Gwynedd, Mrs. Faust, testified that the frequency of E.G.'s disruptive behaviors decreased during the time he was a student in her class. Due Proc. Hr'g Tr. 59-60, 93, 147-48 (Testimony of Margaret Faust). Improvements in behavior continued into the next school year, when E.G. attended Nexus; both the speech and language therapist at Nexus as well as the acting Special Supervisor of Special Education at Lower Gwynedd (who observed E.G. in a Nexus classroom) testified that they did not find E.G.'s behaviors disruptive to his or other students' learning. Due Proc. Hr'g Tr. 496-98 (Testimony of Sue Knickerbocker); Due Proc. Hr'g Tr. 590 (Testimony of Kelly Larson). This testimony is consistent with the nontestimonial evidence. Mrs. Faust's comments in daily communication logs sent to the parents did not record a pattern of disruptive behavior impeding classroom learning. Due Proc. Hr'g Tr. 59, 93 (Testimony of Margaret Faust); Pls.' Due Proc. Hr'g Ex. 33; Def.'s Due Proc. Hr'g Ex. 6. Nexus records, reviewed by Wissahickon personnel in preparation for drafting the September 2005 IEP, also did not reveal significant behavioral problems. Due Proc. Hr'g Tr. 478-80 (Testimony of Sue Knickerbocker); Pls.' Due Proc. Hr'g Ex. 32. The April 2004 and September 2005 IEPs each contained an item reading, "[b]ehaviors that impede his/her learning or that of others";

---

[7] This provision was removed from the Code of Federal Regulations on October 13, 2006, but was effective at the times the parties met to develop E.G.'s IEPs.

E.G.'s parents, who attended IEP meetings and provided numerous suggestions, did not request that the box accompanying this item be checked.  Due Proc. Hr'g Tr. 478-80 (Testimony of Sue Knickerbocker); Pls.' Due Proc. Hr'g Exs.12, 95; Def.'s Due Proc. Hr'g Exs. 9, 36.

E.G.'s parents are concerned that the IEPs do not address E.G.'s behavioral issues, but the ultimate issue under IDEA is whether the IEPs are reasonably calculated to confer a meaningful educational benefit.  *Polk*, 853 F.2d at 181.  E.G.'s teachers, who were in the best position to assess this, determined that he had received and would continue to receive a meaningful educational benefit, despite any behavioral issues.  We give due weight to the finding that E.G.'s behaviors did not impede classroom learning, and conclude that the April 2004 and September 2005 IEPs provided a meaningful educational benefit without need for a FBA.

### b.    Educational Levels

The parents claim the April 2004 and September 2005 IEPs were inadequate because they were not based on E.G.'s then-current educational levels.  E.G.'s last cognitive testing was in 2003.  The parents argue that, prior to developing the IEPs, new cognitive testing was needed  to ensure the IEPs provided meaningful educational benefit.  Wissahickon argues that the IEP team sufficiently assessed E.G.'s educational levels.

An IEP must contain a statement of a student's present educational levels.  20 U.S.C. § 1414(d)(1)(A)(i)(I).  Prior to drafting the IEP, the IEP team must review existing evaluation data, including classroom observations and information provided by the child's parents.  *Id.* § 1414(c)(1).  The IEP team must then identify any additional data necessary to assess the child's educational levels and determine whether modifications to the IEP are needed to enable the child to meet the IEP's annual goals.  *Id.*

The Appeals Panel affirmed the Hearing Officer's finding that Wissahickon offered an

appropriate educational program based on E.G.'s then-current educational levels. We find no

contrary nontestimonial evidence in the record to warrant overturning this finding. The April

2004 IEP details 2003 assessments of E.G.'s speech, language, and behavioral skills, as well as

April 2004 assessments of E.G.'s progress in occupational and physical therapy. Pls.' Due Proc.

Hr'g Ex. 12. To prepare the April 2004 IEP, Wissahickon's Special Education Supervisor

reviewed her notes from observations of E.G. at the Mulberry School during the fall of the 2003-

2004 school year, and conferred with E.G.'s teachers about his placement at Lower Gwynedd

during the beginning of the spring term of the 2003-2004 school year. Due Proc. Hr'g Tr. 902-04

(Testimony of Patricia Mueller). Occupational and physical therapists at Wissahickon, who had

worked with E.G. for five weeks prior to the development of the April 2004 IEP, attended IEP

meetings and recommended modifications to the IEP goals and objectives. *Id.* at 866.

The September 2005 IEP is also based on then-current educational levels, as specific

reading and mathematical tests were administered to E.G. just prior to drafting the IEP. Pls.'

Due Proc. Hr'g Ex. 95; Def.'s Due Proc. Hr'g Ex. 9. To prepare the September 2005 IEP, the

IEP team reviewed the April 2004 IEP and Nexus records of E.G.'s progress during the 2004-

2005 school year, and visited Nexus to observe E.G. in a classroom. Due Proc. Hr'g Tr. 479-81,

496-98 (Testimony of Sue Knickerbocker). The IEP team also considered whether additional

data would be necessary to obtain an accurate estimate of E.G.'s educational levels, and prepared

a re-evaluation report further assessing E.G.'s levels. *Id.* at 211-16; Due Proc. Hr'g Tr. 920-24

(Testimony of Patricia Mueller). Wissahickon considered conducting new cognitive testing (as

the parents now argue was necessary, although they did not request cognitive testing at the IEP

meetings), but decided against it because of the difficulty in assessing cognitive ability in an

autistic child on the lower end of the spectrum with poor attention span and lack of language

16

skills.  Due Proc. Hr'g Tr. 1239-40 (Testimony of Gail H. Mallet).  The administrative record

shows the IEP team reviewed sufficient data and assessed E.G.'s educational levels when

drafting his IEPs.

<strong>c.     Least Restrictive Environment</strong>

The parents argue that the April 2004 and September 2005 IEPs, providing for part-time

placement in a regular education classroom and part-time placement in a learning support

classroom, were inadequate because the regular education curriculum was too advanced.  The

parents, claiming IDEA's requirement of education in the least restrictive environment must be

tempered with IDEA's requirement that an educational program be appropriate to the unique

needs of the individual child, argue that E.G. needed special instruction, such as placement in a

full-time autistic support program as well as a home program. Wissahickon responds that the

April 2004 and September 2005 IEPs conferred a meaningful educational benefit in the least

restrictive environment, as required by IDEA.

IDEA requires that states ensure, "[t]o the maximum extent appropriate, children with

disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A).

This provision sets forth a strong preference for integrating children with disabilities into regular

education classrooms, i.e., the "least restrictive environment." *Oberti*, 995 F.2d at 1213-14 &

1213 n.17.  In *Oberti v. Bd. of Educ.*, our Court of Appeals acknowledged the apparent tension

between IDEA's preference for inclusion in the regular education classroom, and IDEA's

requirement that schools provide an individualized program tailored to the specific needs of each

disabled child.  *Id.* at 1214.  To resolve this tension, a court must consider "whether a child can

be educated satisfactorily in a regular education classroom with supplementary aids and

services." *Id.* at 1215-16. *Oberti* provides several factors relevant to this inquiry.[8] First, a court should consider whether a school has provided a range of supplemental aides and services, such as speech and language therapy, special education training for the regular education teacher, curriculum modification, and behavior modification programs. *Id.* at 1216. Second, a court should compare the educational benefits of a regular education classroom to those of a special education classroom. *Id.* In making this comparison, "a court must pay special attention to those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers." *Id.* "Congress understood that a fundamental value of the right to a public education for children with disabilities is the right to associate with nondisabled peers." *Id.* at 1216-17. Finally, a court should consider the possible negative effect inclusion may have on other students in the regular education classroom, with an awareness that supplemental aids and services can prevent behavioral disruptions that might otherwise occur. *Id.* at 1217.

The Appeals Panel determined that the April 2004 and September 2005 IEPs enabled meaningful educational progress because they were similar to prior IEPs under which E.G. made significant progress, and because they contained very specific goals and objectives. Giving due weight to the Appeals Panel's determinations, we agree that the IEPs enabled meaningful

---

[8] The facts of *Oberti* differ from those of the instant case: the parents in *Oberti* sought placement in a regular education classroom rather than in a segregated special education classroom; E.G.'s parents seek the opposite. Nonetheless, the central issue in *Oberti* – whether the least restrictive environment is an appropriate and individualized placement – is also the central issue here. The standard provided in *Oberti* for balancing IDEA's mandate for the least restrictive environment with IDEA's mandate for an appropriate and individualized educational program is applicable.

educational progress in the least restrictive environment. First, the April 2004 and September 2005 IEPs provided for a range of supplementary services to support E.G.'s unique needs. These included occupational, physical, and speech therapy, as well as regular education teacher training in inclusion of a disabled child in a regular classroom, teaching a child with autism, behavioral techniques, sign language, and computer software programs. Pls.' Due Proc. Hr'g Exs. 12, 95; Def.'s Due Proc. Hr'g Exs. 9, 36. Had E.G. attended Lower Gwynedd in the 2005-2006 school year, his regular education teacher had planned curriculum modifications, small group work to facilitate peer modeling and socialization, and support from a one-to-one aide. Due Proc. Hr'g Tr. 544-46, 553-55, 562-63 (Testimony of Robin Daher).

Second, comparing the educational benefits obtained in a regular education classroom to those obtained in a segregated special education classroom, E.G. attained meaningful benefits when placed in a regular education classroom at Lower Gwynedd during the spring of the 2003-2004 school year. E.G.'s second grade teacher testified that E.G. made "incredible" progress in a short amount of time in socialization as well as academic skills. Due Proc. Hr'g Tr. 118-19, 147-50 (Testimony of Margaret Faust). She discussed at length that his level of confidence increased from interaction with nondisabled peers. *Id.* at 147-50.

Finally, as to the possible negative effect of inclusion, the Hearing Officer found that E.G.'s behaviors did not impede his or others' learning; we have already accorded due weight to this finding. The record supports the Appeals Panel's conclusion that the IEPs were reasonably calculated to provide E.G. with a meaningful educational benefit in the least restrictive environment. IDEA requires no more.

## 2. Ready, Willing, and Able to Implement the September 2005 IEP

The parents argue that Wissahickon denied E.G. a FAPE because it was not ready,

willing, and able to implement the proposed September 2005 IEP. They note that at the start of the 2005-2006 school year, assistive technology, promised in the IEP, had not been obtained, and staff training proposed by the IEP remained incomplete. The parents also express dissatisfaction with a perceived low level of supervision by the Wissahickon administration over the teachers who would implement the proposed September 2005 IEP. Wissahickon responds that the parents' concerns are speculative. Had E.G. actually attended Lower Gwynedd for the 2005-2006 year, the training and support outlined in the September 2005 IEP would have been provided.

The Appeals Panel affirmed the Hearing Officer's finding that Wissahickon was ready, willing, and able to implement the proposed September 2005 IEP. Our review of the record finds no contrary nontestimonal evidence. IDEA's requirement that the planned educational program be reasonably calculated to confer meaningful educational benefit is prospective. *Allyson B. ex rel. Susan B. v. Montgomery Cnty. Intermediate Unit*, No. 07-2798, 2010 WL 1255925, at *13 (E.D. Pa. Mar. 31, 2010) (Pollak, J.). The record shows that Wissahickon planned curriculum modifications, learning support services, and a one-to-one aide to assist E.G., among other support services. The Appeals Panel determined that Wissahickon was prepared to implement these services; whether each would actually be implemented is speculation. Giving due weight to the Appeals Panel's determination, we agree.

### 3. Procedural Violation

The parents contend that Wissahickon did not provide a FAPE for the 2004-2005 school year because it failed to comply with IDEA's procedural requirement that a school district develop an IEP for all students residing within their district. *See* 20 U.S.C. § 1414(d)(2). E.G.'s April 2004 IEP expired in April 2005, and Wissahickon provided no IEP from April through

September 2005. As a consequence, E.G. did not receive an ESY program during the summer of 2005. Wissahickon argues they were not obligated to provide an IEP for E.G. after his parents unilaterally withdrew him from Lower Gwynedd and placed him in the Nexus School. Had E.G. attended Lower Gwynedd for the 2004-2005 school year, Wissahickon would have implemented E.G.'s April 2004 IEP until April 2005, at which point it would have developed a new IEP.

IDEA and its corresponding regulations provide that if a school district makes a FAPE available to a child residing within their district, the school is not obligated to reimburse tuition when the parents reject the offer of FAPE and place the child in private school. 20 U.S.C. § 1412(10)(C)(i); 34 C.F.R. § 300.403(a) (2004). A public school district need not assume public school placement for every private school child residing within the district. 64 Fed. Reg. 12406, 12601 (1999). Instead, because IDEA requires that a public school district make a FAPE available to all disabled students residing within the district, school districts "must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents re-enroll the child in public school." *Id.*

The Appeals Panel affirmed the Hearing Officer's decision that Wissahickon did not violate IDEA's procedural requirement by allowing the April 2004 IEP to expire. Wissahickon was prepared to implement the April 2004 IEP. Due Proc. Hr'g Tr. 865-66, 892-900, 907-11 (Testimony of Patricia Mueller). The April 2004 IEP constituted an offer of a FAPE. When E.G.'s parents rejected the IEP and enrolled him in Nexus for the 2004-2005 school year, Wissahickon was not obligated to continue to develop an IEP. *See* 20 U.S.C. § 1412(10)(C)(i); 34 C.F.R. § 300.403(a) (2004); 64 Fed. Reg. 12406, 12601 (1999). Wissahickon's obligations resumed when E.G.'s parents notified Wissahickon that E.G. would re-enroll for the 2005-2006

school year, and Wissahickon met its obligation by developing the September 2005 IEP.[9]  Due

Proc. Hr'g Tr. 211-16, 475-76, 481-82, 485, 489 (Testimony of Sue Knickerbocker); Due Proc.

Hr'g Tr. 1159-60 (Testimony of E.G.'s mother); Pls.' Due Proc. Hr'g Exs. 50-52.  Because

Wissahickon developed and was prepared to implement an IEP at all times required by IDEA,

there was no violation of IDEA's procedural requirements.

\* \* \* \* \*

Based on review of the administrative record, we conclude that Wissahickon provided

E.G. with a FAPE for the 2004-2005 and 2005-2006 school years.  The parents are not entitled to

reimbursement.  *See Carter*, 510 U.S. at 12-16; *Burlington*, 471 U.S. at 369-70, 373-74.  E.G. is

not entitled to an award of compensatory education.  *See Ridgewood*, 172 F.3d at 250.  The

Appeals Panel's decision to deny reimbursement of tuition and related expenses and deny

compensatory education is affirmed.[10]

---

[9] The parties accuse each other of unnecessary delay and obstruction in developing the
September 2005 IEP.  The parents state that Wissahickon required E.G. to re-register in the
school district, and contend that re-registration was unnecessary because although E.G. attended
private school, he resided within the Wissahickon district.  Wissahickon argues that E.G.'s
mother prevented Nexus personnel from providing the Wissahickon IEP team with E.G.'s
progress reports.  Because the relevant inquiry is whether the school district developed an IEP
upon receiving notice that E.G. would return to public school, and because Wisshickon did
develop the September 2005 IEP, there is no need to assess the blame of either party.

[10] The parents argue that the Hearing Officer and Appeals Panel failed to consider their
request for compensatory education.  Although neither decision specifically refers to
compensatory education, both decisions conclude that Wissahickon provided a FAPE.  Because a
party is entitled to an award of compensatory education only if a FAPE is denied, *see Ridgewood*,
172 F.3d at 250, the conclusion that Wissahickon provided a FAPE is sufficient, even if the
words "compensatory education" do not appear in the administrative decisions.
    The parents, citing the Supreme Court's recent decision in *Winkelman v. Parma City Sch.
Dist.*, 550 U.S. 516 (2007), also argue that parents have their own statutory entitlements under
IDEA, and Wissahickon failed to respect those entitlements.  In *Winkelman*, the Supreme Court
decided "whether parents, either on their own behalf or as representatives of the child, may
proceed in court unrepresented by counsel even though they are not trained or licensed as

### D.    Reimbursement Obligation

The parents contend the Appeals Panel erred by failing to order Wissahickon to comply with a reimbursement obligation the parents claim was owed them under E.G.'s December 2003 IEP.  Due Proc. Hr'g Tr. 1080-83 (Testimony of E.G.'s mother); Pls.' Due Proc. Hr'g Ex. 29. The December 2003 IEP provided that Wissahickon would reimburse the parents for the costs of a home program of 25 hours per week when school was in session, and 35 hours per week when school was not in session.  Pls.' Due Proc. Hr'g Ex. 28.  While due process proceedings over the December 2003 IEP were pending, Wissahickon reimbursed the parents for the costs of a home program at 25 hours per week.  The issue is whether school was "in session" while due process proceedings over the December 2003 IEP were pending.  If so, then Wissahickon owes the parents an additional $5000.  If not, Wissahickon owes nothing.

The decision of the Appeals Panel does not specifically address this issue, but the order of the Appeals Panel dismissed any remaining exceptions to the Hearing Officer's decision not specifically addressed.  We affirm the Appeals Panel's dismissal of the parents' claim for an additional $5000 for reimbursement of home program costs.  During the pendency of the due process proceedings, Wissahickon was obligated to continue to offer the December 2003 IEP. *See* 20 U.S.C. § 1415(j).  The due process proceedings ultimately concluded that this IEP constituted a FAPE.   School therefore remained in session.  Under the terms of the IEP, the

_____

attorneys."  *Id.* at 520.  Deciding this issue required the Court to determine if IDEA accords parents their owns rights capable of being vindicated in court proceedings.  *Id.*  The Court held that "IDEA grants parents independent, enforceable rights.  These rights, which are not limited to certain procedural and reimbursement-related matters, encompass the entitlement to a free and appropriate public education for the parents' child."  *Id.* at 533.  Because we find that Wissahickon provided a FAPE, we find that neither E.G.'s nor and his parents' rights under IDEA were violated.

parents were owed reimbursement only for 25 hours per week, an amount that Wissahickon has already paid.  Nothing further is owed.

**III.     CONCLUSION**

For the reasons explained above, defendant's motion for judgment on the administrative record is granted, and plaintiffs' is denied.  An appropriate order follows.